_____

|

DEMATIC CORPORATION,                               |          Case No. 1:08-cv-730

                                                   |

          Plaintiff,                               |          Honorable Paul L. Maloney

                                                   |

          v.                                       |

                                                   |

INTERNATIONAL UNION, UNITED AUTOMOBILE             |

AEROSPACE, AND AGRICULTURAL IMPLEMENT              |

WORKERS OF AMERICA (UAW) and                       |

UAW LOCAL 1485,                                    |

                                                   |

          Defendants.                              |

                                                   |

_____

### OPINION and ORDER

**Granting Plaintiff Dematic's Motion for Summary Judgment;**
**Denying Defendant UAW's Motion for Summary Judgment;**
**Vacating the Arbitration Award;**

**Terminating and Closing the Case**

Plaintiff Dematic Corporation brings this action to vacate an arbitration award under the

Labor Management Relations Act of 1947, as amended, 29 U.S.C. § 185 ("LMRA"). *See* Complaint

filed August 4, 2008 ("Comp") ¶ 1. The defendants, the International Union, United Automobile,

Aerospace, and Agricultural Implement Workers of America and its Local 1485 ("UAW"), ask the

court to confirm the award. The court has undisputed jurisdiction under LMRA and the Federal

Arbitration Act, 9 U.S.C. § 1, *et seq.* ("FAA"). The parties have filed cross-motions for summary

judgment. For the reasons that follow, the court will grant summary judgment to Dematic and

vacate the arbitration award. The award was not merely erroneous; it strayed from the realm of interpretation entirely and attempted to impose the arbitrator's own brand of industrial justice.

## BACKGROUND

Dematic and the UAW entered into a collective bargaining agreement ("CBA") in June 2004 which lasted until June 10, 2009 "and thereafter until sixty (60) days after either party shall serve written notice of a desire to terminate, modify . . . or amend this Agreement." Comp ¶ 7 and Ex 1 (CBA) at 72 § 186 ("Duration and Renewal of Agreement"). So far as the record reflects, neither party has served written notice of its desire to terminate, modify or amend this 2004-2009 CBA.

The CBA reserves to Dematic "[a]ll the functions and responsibilities which Management had prior to the signing of this Contract . . . except as specifically limited, restricted, or modified by the written provisions of this contract." CBA § 3. The CBA also provides that it is a complete agreement, and that the parties are not obligated to collectively bargain with regard to any issue, without regard to whether it was addressed by the CBA or discussed during negotiations:

> The parties acknowledge that during the negotiations which resulted in this Agreement, each had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining, and that the parties [sic, perhaps was intended to read to the effect of "the parties' rights and obligations"] after the exercise of that right and opportunity are set forth in this Agreement.

> Therefore, the Company and the Union, for the life of this Agreement, each voluntarily and unqualifiedly waivers [sic] the right and each agrees, that the other shall not be obliged to bargain collectively with respect to any subject or mattered referred to, or covered in this Agreement, or with respect to any subject or matter *not* specifically referred to or covered in this Agreement even though such subject or matter may not have been within the knowledge or contemplation of either or both parties at that time that they negotiated or signed the Agreement.

CBA § 4 (emphasis added, paragraph break added).

The parties argue over the applicability and interpretation of four contractual provisions which substantively address Dematic's obligation to continue providing certain laid-off employees with fringe benefits (life insurance, hospitalization insurance, hospitalization coverage, and dental insurance). Namely, Dematic maintains that the following four substantive provisions, by their plain language, defeat the UAW's claim to additional benefits:

154. LIFE INSURANCE

The Company will provide $55,000 life insurance coverage, including accidental death and dismemberment coverage for each employee. This policy will also include . . . . *If an employee is laid off due to lack of work, retains seniority, and is not employed by any other employer, the Company shall at its own expense, continue to carry the company-provided insurance for the balance of the month in which the employee is laid off, plus two full calendar months following layoff.* Any supplemental / dependent coverage must be paid for by the employee.

* * *

156. HOSPITALIZATION [footnote 14 citing Letter of Understanding No. 11]

Effective January 1, 2004, the Company will provide to all employees, their dependents and retirees the benefits described in the Summary Plan Description . . . . The cost of this benefit will be shared between the Company and the Employee. * * *

*If an employee is laid due to lack of work, retains seniority, and is not employed by any other employer, the Company shall, at its expense, continue to provide the benefits for the balance of the month in which the employee is laid off, plus two full calendar months following layoff.* Thereafter, the employee and/or dependents will be able to continue the benefit as specified in the Summary Plan Description. * * *

157. Any employee desiring to carry such insurance as stated in paragraph 156 [hospitalization], must pay the Company the full cost of the Premium on or before the first day of the third month following the month in which he is laid off. Premiums must be paid on or before the first day of each month thereafter . . . .

158. The Company will continue to provide all employees, their dependents and retirees, dental insurance as described in the Summary Plan Description. * * * *If an employee is laid due to lack of work, retains seniority and is not employed by any other employer, the Company shall, at its expense, continue to provide the benefits for the balance of the month in which the employee is laid off, plus the two full calendar months following layoff.* Thereafter, the employee and/or dependents will

be able to continue the benefit as specified in the Summary Plan Description. * * *

CBA at 54-55 § 154 (life insurance) (emphasis added); *id.* at 57-58 §§ 156-157 (hospitalization) (emphasis added); *id.* at 59-60 § 158 (dental insurance) (emphasis added).

Dematic also relies on the agreement's integration clause, which reads as follows:

185. ENTIRE UNDERSTANDING.

This Agreement and supplementary attachments contain the entire understanding between the two parties and supersedes all prior agreements or understandings, written or oral, between the Company and the Union. *Any policies or practices heretofore followed, which are in any way inconsistent with any of the provisions of this Agreement, are hereby revoked.*

Any supplementary agreement negotiated and agreed to between the parties to this Agreement and attached hereto shall become a part hereof as though contained herein. * * *

CBA at 71 § 185 (emphasis added).

Finally, Dematic relies on the fact that by its terms, the CBA limits an arbitrator to applying and interpreting the CBA as written:

The powers of *the arbitrator* shall be limited to the application and interpretation of this Contract as written, and he *shall at all times be governed wholly by the terms of this Contract and shall have no power or authority to change this Contract in any respect, or to add or take away any of its terms.*

CBA at 11 § 30 (emphasis added).

It is undisputed that before this CBA took effect in June 2004, Dematic provided life insurance, hospitalization, and dental-insurance benefits to laid-off employees for longer than the three months now required by the CBA. Comp ¶ 19. Dematic's complaint alleges that since the current CBA took effect in June 2004, it "has exercised [its] specifically stated contractual rights guaranteed by the CBA and has not paid for insurance benefits beyond the limitations set forth in Sections 154, 155f, 156, 157, and 158, in accordance with Section 159a of the CBA." Comp ¶ 18.

The Union, however, alleged that Dematic continued to offer post-voluntary-layoff benefits for a longer period than contractually required until June 2007, when Dematic sent letters announcing that it would discontinue that practice. Comp Ex 4 at 11 (arbitration decision).

About three years into the CBA, in June 2007, the UAW filed two grievances, as permitted by CBA section 39. The first grievance alleged that voluntarily laid-off employees "are now required to pay the cobra [COBRA] rate for health insurance after three months of being laid off. In the past, the company continued to pay for an employee's health insurance for the duration of the layoff," Comp ¶ 19 (quoting Ex 2), while the second grievance stated, "Joe Wekenman was given a voluntary layoff and not told that his insurance would run out at anytime. Past practice – We [sic] have never taken insurance away from employees who elect to take a voluntary [lay-off]", Comp ¶ 20 (quoting Ex 3).

The Arbitrator's Decision in Favor of the UAW

Arbitrator Elaine Frost held a hearing in Michigan on April 10, 2008, heard testimony, accepted exhibits and post-hearing briefs, then issued her decision on May 7, 2008. Comp ¶¶ 21-22 (citing Ex 4 at 1, 8 & 10). The arbitrator awarded voluntarily laid-off employees these types of insurance, paid by Dematic, for up to six months following lay-off, rather than the three months that the parties agree is required by the clear terms of the CBA. Comp Ex 4 at 13. The arbitrator's "Analysis and Conclusions" section stated, in its entirety:

> The question before the arbitrator is whether or not the company is required to pay insurance benefits to employees on voluntary layoff beyond the period set forth in §§ 154 (life), 156 (health) and 158 (dental) of "the end of the month . . . and two full additional months." These sections state that they apply to employees "laid off due to lack of work," and although the Union submits this is not an exact fit for employees on voluntary layoff, because they are not put off work but volunteer to

leave their jobs, the arbitrator notes that the CBA does not have any other language on insurance benefits for voluntary layoff employees. Further, the customary letter sent to employees on voluntary layoff, both before and during the term of the current Agreement, states that "medical, dental and life insurance will remain in effect according to §§ 154, 156 and 158 of the contract." The arbitrator concludes that these three contract provisions cover voluntary layoff.

The Company's view is th the matter is here at an end, because if voluntary layoffs are covered by §§ 154, 156 and 158 they are also covered by the length[-]of[-]benefits language in those Sections. The Union, however, presents a case for past practice which extends the length of coverage under §§ 154, 156 and 158 for voluntary layoff, such that their insurance benefits are extended throughout the voluntary layoff, up to six months. This Union position rests on how things have happened in the past. Thus, it presented evidence of a long-standing (one witness said 16.5 years) practice that employees on voluntary layoff received extended insurance benefits beyond two months. Also the Union's evidence was that there was a verbal agreement between the Union President and the Company's then Human Resource Director Barrie Bechtel "about eight years ago," [in the year 2000] after the Company had decided to discontinue insurance benefits for voluntary layoff beyond the contractual "two months," and this triggered discussions. [Union president] Sikkema said he focused in those discussions on the cost-savings to the Company of continuing extended benefits and the result was that [Dematic HR Director] Bechtel agreed. Thereafter, the practice continued of extended insurance benefits under §§ 154, 156 and 158 with no "two month" cut-off for voluntary layoff.

The evidence of past practice for extended insurance benefits for voluntary layoff is viewed by the arbitrator as strong and that evidence on past practice is not disputed. And, importantly, the Company agreed not to go through with its intention eight years ago to enforce the §§ 154, 156 and 158 language on length of benefit during voluntary layoff, agreeing instead to continuing [sic] the practice of extending benefits to such employees. And after the "Bechtel accord" [in the year 2000] the practice of extended benefits for voluntary layoff under §§ 154, 156 and 158 continued for several years.

*Under the combined circumstances of the undisputed practice of providing extended insurance benefits, followed by the Bechtel accord, followed by the continued practice of paying those benefits for several more years, the arbitrator concludes that the parties effectively modified the §§ 154, 156 and 158 length[-]of[-]benefits language for employees on voluntary layoff. In other words, the arbitrator concludes that the parties effectively altered facially clear contract language [in the CBA that did not take effect until June 2004] on the length of time benefits are paid in the case of employees on voluntary layoff.*

In reaching this result the arbitrator notes that there is a causal link between

extending insurance benefits for voluntary layoff as opposed to involuntary layoff where the contractual time-limit undisputably [sic] applies. Thus, these are senior employees on voluntary layoff who were not forced off work; instead they agreed to leave their jobs and allow others to continue working, and these senior employees have the right to return to active status anytime after the first 60 days of layoff, with five days notice. That situation is strikingly different from an employee involuntarily laid off who might never return to active employment with the Company. It appears, moreover, as presented by the Union, that having senior employees remain on voluntary layoff beyond the initial 60-day term can benefit the Company by avoiding multiple bumpings, and it is clear that on at least one occasion the Company asked an employee to extend his voluntary layoff.

In part, the Employer argues that any change from the express provisions of §§ 154, 156 and 158 to employees on voluntary layoff is unsupportable because the length of the insurance benefits is crystal clear in that language and the arbitrator, therefore, lacks authority to alter its meaning. (§ 30)

*Although it is generally true that clear contract language prevails over inconsistent past practice, no matter how equitable following that practice might be, it is also true, that an arbitrator has the authority, as a function of interpreting contract language, to consider whether or not a past practice amounted to mutual intent of the parties to change application of otherwise clear contract language.* And a mutual change under §§ 154, 156 and 158 is what the undersigned arbitrator finds happened in this case eight years ago, in the context of the past practice before the Bechtel accord, the accord itself and the past practice that event [sic].

The arbitrator went on to discuss CBA section 185, which expressly precludes the notion that the company's voluntary payment of more benefits than required under an expired CBA, in the past, somehow obligated it to now pay more than the new CBA requires. The arbitrator did not purport to apply Michigan contract law to the construction of the current CBA. Without citing judicial authority, the arbitrator refused to apply section 185:

Remaining is question [sic] of § 185 (entire agreement) and whether it operates to disallow operation [sic] of the past practice of [providing] extended insurance benefits under [sic] §§ 154, 156 and 158, even though that practice is supported by a mutual accord, because neither the practice nor the Bechtel accord were placed in writing. In the current contract, dated June 10, 2004, § 185, entitled, ENTIRE UNDERSTANDING, provides in part that:

This Agreement and supplementary attachments contain the entire understanding between the two parties and supersedes all prior agreements or understandings, written or oral, between the Company and the Union. Any policies or practices heretofore followed, which are in any way inconsistent with any of the provisions of this Agreement, are hereby revoked. Any supplementary agreement attached hereto shall become a part hereof as through contained herein . ... .

The Company maintains that even if there was an established and otherwise binding past practice in the past [sic], and even if that practice in the past changed the application of length of insurance coverage under §§ 154, 156 and 158 , that both the past practice and any variant interpretation of §§ 154, 156 and 158 necessarily fails before the acceptance of the provisions of § 185 on June 10, 2004 which is the effective date of the current contract. Here the Company emphasizes that in the last round of negotiations the parties set aside all provisions of the CBA and then agreed to the entire new CBA, that by doing that and by putting the § 185 entire agreement [provision] in the current contract, the former past practice [sic] on extended insurance benefits became null and void. And in this regard the Company points to the undisputed fact that under the current contract no employee on voluntary on voluntary layoff has received insurance benefits beyond the "two months" coverage provided for by the express terms of §§ 154, 156 and 158, so there has been no continuation of the practice under the current agreement.

The Union counters that § 185 (entire agreement) does not operate as the Union [sic, should be Dematic] suggests, claiming instead that the current CBA simply returned the same entire agreement clause to the contract as has been in the CBA for 39 years, and that this entire agreement clause does not cut off the extended insurance benefits for voluntary layoff any more than the prior contracts over the many years cut off those benefits.

The question of whether an entire agreement or zipper clause in a CBA can by its terms eliminate otherwise binding practices has been addressed by arbitrators over the years in a number of situations with a number of variously phrased zipper clauses. [citing Elkouri & Elkouri, How Arbitration Works (6th ed.) at 620-23.] There are decisions concluding that a provision including (as does § 185) that "any . . . practices heretofore followed, which are in any way inconsistent with any of the provisions of this Agreement, are hereby revoked," required that the grievance seeking to uphold a past practice be denied. [citing *Bassick Co.*, 26 LA 627, 630 (Theodore Kheel 1956)]

But another key arbitration case upheld a practice [sic] [presumably intends to state "required a party to a CBA to continue a practice"] despite a zipper clause[,] finding "no magical dissolving effect upon practices or customs which are continued in fact

unabated and which span successive contract periods." [citing *Fruehauf Trailer co.*, 29 LA 372, 375 (Edgar Jones, Jr. 1957)]

A helpful treatment of the subject appears in the case of *School City of Hobart* [sic], 86 LA 557 (Ellen J. Alexander 1985), where that arbitrator considered a zipper clause that stated, in part, that "it cancels all previous agreements, verbal and written or based on alleged past practices . . . ." That arbitrator denied a grievance where the employer had discontinued two early-release days and half-day-record benefits for teachers. The arbitrator indicated that the zipper clause " . . . precluded whatever claims of established past practice are made and on which the contract is silent (absent perhaps exceedingly clear evidence of intent by the parties to bypass this contract cause) . . . ." (p 562) That decision went on to state that "Arbitrators have the authority to interpret the contract, not to modify the terms absent clear evidence that the parties themselves had, by their practice[,] modified the terms." (p 563).

From this arbitral precedent [sic] a number of factors which need be considered in the instant dispute in order for the undersigned to decided [sic] if the § 185 entire agreement) clause eliminates the practice of affording employees on voluntary layoff extended insurance benefits. Factors here include the clarity or lack of clarity of the practice; the length of time the practice was followed and whether it was followed under successive contracts containing the same zipper clause; and the existence of any "clear evidence" showing mutual intent to continue the practice regardless of inconsistent written contract terms.

Having considered the application of the entire agreement clause contract (§ 185) clause [sic] in the context of this case the arbitrator is persuaded that the practice of extended insurance benefits is not barred. Thus, the practice was clearly followed through successive contracts with the same entire agreement clause language; eight years ago, while the past practice was in effect, the Company decided to stop extended benefits but then, after discussions with the Union, agreed it would still follow the practice, thereby showing mutual agreement based on mutual benefit to continue the practice[,] which was inconsistent with contract language on the length of time benefits are paid; that the prior accord resolved (eight years ago [in 2000]) the very same question which is presented by the instance [sic] case, resolving it in favor of continuation of the practice that gives employees on voluntary layoff benefits not cut-off by the "two months" contractual limitation. Under these combined circumstances and under the arbitrator's view that the parties in the Bechtel accord verbally amended application of the length of benefits under §§ 154, 156 and 158, the arbitrator concludes that the grievance should be granted.

Comp Ex 4 at 9-13 (footnotes 12-21 omitted, ¶ breaks added). The arbitrator ordered Dematic to

"pay health insurance for employees on voluntary layoff for a period of up to six months." *Id.* at 13.

Neither the arbitrator nor the UAW has claimed that the CBA's language arguably refers to a six-month period of employer-paid insurance benefits following voluntary lay-off.

### STANDARD OF REVIEW

Federal law governs the interpretation and enforcement of CBAs under section 301 of LMRA, 29 U.S.C. § 185, but traditional rules of contract interpretation apply insofar as they are consistent with federal labor policies. *Yard-Man*, 716 F.2d at 1479.[1]

"The construction and interpretation of CBAs is a task for labor arbitrators and not the federal judiciary." *Sterling Fluid Sys. (USA), Inc. v. Chauffeurs, Teamsters & Helpers Union Local No. 7, IBT*, 322 F. Supp.2d 837, 842 (W.D. Mich. 2004) (citing, *inter alia*, *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 599 (1960)), *aff'd*, 144 F. App'x 457 (6th Cir. 2005). A federal court's review of an arbitrator's decision is "very narrow: 'one of the narrowest standards of judicial review in all of American jurisprudence.'" *Sterling Fluid*, 322 F. Supp.2d at 842 (quoting *Lattimer-Stevens v. United Steelworkers of America*, 913 F.2d 1166, 1169 (6th Cir. 1990)).

"The arbitrator must make the factual findings, and a court may not reject those findings simply because it disagrees with them.'" *Sterling Fluid*, 322 F. Supp.2d at 842 (quoting *United Paperworks Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 38 (1987) and citing *Int'l Ass'n of Machinists & Aerospace Workers v. TVA*, 155 F.3d 767, 771 (6th Cir. 1998) ("A court cannot make

---

[1] "This is not to say that the [CBA] should be construed to affirmatively promote any particular policy but rather that the interpretation rendered not denigrate or contradict basic principles of federal labor law." *Grimes v. Dayton-Walther Corp.*, 680 F. Supp. 1110, 1118 (S.D. Ohio 1987) (Rice, J.) (citing *Yard-Man*, 716 F.2d at 1479-80 and *Weimer v. Kurz Kasch, Inc.*, 773 F.2d 669, 673 (6th Cir. 1985) and *Policy v. Powell Press Steel*, 770 F.2d 609, 614 (6th Cir. 1985)).

findings of fact independent of the arbitrator.")).

> The arbitrator's interpretation of a CBA is also accorded great deference:

> The arbitrator may not ignore the plain language of the contract; but the parties having authorized the arbitrator to give meaning to the language of the agreement, a court should not reject an award on the ground that the arbitrator misread the contract . . . . [A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, [the fact] that a court is convinced he committed serious error does not suffice to overturn his decision.

*Misco*, 484 U.S. at 38; *see also Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) ("*MLBPA*"). Although an arbitrator may look to outside sources to aid in interpreting a CBA, he must be *construing* the contract, not amending it. *See Int'l Paper Co. v. United Paperworkers Int'l Union*, 215 F.3d 815, 817 (8th Cir. 2000) (citing *Keebler Co. v. Milk Drivers & Dairy Employees Union*, 80 F.3d 284, 288 (8th Cir. 1996)).

Until 2007, our circuit merely followed the rule that if an arbitrator's decision and award "draws its essence" from the CBA and is not merely the arbitrator's own brand of "industrial justice", the court must uphold the award. *See Eastern Assoc'd Coal Corp. v. UMWA*, 531 U.S. 57, 62 (2000) (quoting *Misco*, 484 U.S. at 38). However, "when the arbitrator's words manifest an infidelity to the obligation to craft an award that draws its essence from the collective bargaining agreement, the arbitrator has exceeded the scope of his authority, and 'courts have no choice but to refuse enforcement of the award.'" *Sterling Fluid*, 322 F. Supp.2d at 842 (quoting *Enterprise Wheel*, 363 U.S. at 597) (internal brackets and alterations omitted).

In 2007, our Circuit sitting *en banc* strengthened the deference due to arbitral decisions. Discussing Supreme Court precedent governing judicial review under the FAA, the Sixth Circuit majority remarked, "The Court's repeated insistence that the federal courts must tolerate 'serious' arbitral errors suggests that judicial consideration of the merits of a dispute is the rare exception, not

the rule." *Michigan Family Resources, Inc. v. Service Employees Int'l Union Local 517M*, 475 F.3d 746, 753 (6th Cir.) (*en banc*) (Sutton, J.) ("*Michigan Family*"), *cert. denied*, – U.S. –, 127 S.Ct. 2996 (2007). The Circuit also cautioned, however, that this heightened deference cannot excuse an arbitral award that simply disregards or refuses to follow the CBA's plain terms. "At the same time, we cannot ignore the specter that an arbitration decision could be so 'ignorant' of the contract's 'plain language,' *Misco*, 484 U.S. at 38 . . . as to make implausible any contention that the arbitrator was construing the contract." *Michigan Family*, 475 F.3d at 753.

Unsurprisingly, in the two years since *Michigan Family*, our Court of Appeals and our circuit's district courts have usually refused to disturb arbitral awards, perhaps more often than they did under the former standard of review. *See, e.g., Truck Drivers Local No. 164 v. Allied Waste Sys., Inc.*, 512 F.3d 211 (6th Cir. 2008) (Martin, Batchelder, Clay); *Kroger Co. v. United Food & Commercial Workers Union Local 876*, 284 F. App'x 233 (6th Cir. 2008) (Gibbons, Sutton, D.N.J. D.J. Ackerman); *Michigan Sugar Co. v. Bakery, Confectionery, Tobacco Workers and Grain Millers Int'l Union*, 278 F. App'x 628 (6th Cir. 2008) (Guy, Suhrheinrich, Cole); *Roll Coater, Inc. v. Chauffeurs, Teamsters and Helpers Local Union No. 215*, 263 F. App'x 445, 448-49 (6th Cir. 2008) (Moore, Richard Allen Griffin, S.D. Ohio D.J. Graham); *UAW Local 174 v. Michigan Mech. Servs., Inc.*, 247 F. App'x 649 (6th Cir. 2007) (Keith, Moore, Cole); *Appalachian Regional Healthcare, Inc. v. Kentucky Nurses Ass'n*, No. 06-6470, 2007 WL 4269063 (6th Cir. Dec. 4, 2007) (p.c.) (Moore, Richard Allen Griffin, E.D. Mich. D.J. Tarnow) (not in F. App'x).

Nonetheless, at least two Sixth Circuit panels have affirmed a district court's *vacatur* of arbitral decisions where the arbitrators flouted their obligation to construe a contract's terms. *See Totes Isotoner Corp. v. Int'l Chem. Workers Union Council / UFCW Local 664C*, 532 F.3d 405, 412

(6th Cir. 2008) (Clay, joined by N.D. OHIO D.J. Christopher Boyko) ("*Totes*") ("Although this Court should be loath to vacate an award in a labor arbitration dispute, there are occasions in which judicial intervention may be warranted."); *Peterbilt Motors Co. v. UAW Int'l Union*, 219 F. App'x 434, 439 (6th Cir. 2007) (Batchelder, McKeague, D.N.J. D.J. Ackerman) ("This is not simply a serious arbitral error that we should hold binding on Peterbilt because serious errors are a risk inherent in arbitration. This is a determination without any basis in the contract . . . .").

**LEGAL STANDARD: Interpretation of a Collective Bargaining Agreement**

When interpreting a CBA, the court must start with its explicit language, and "[g]eneral principles of contract interpretation should guide a district court's interpretation of" that language. *Tackett v. M&G Polymers USA, LLC,* 561 F.3d 478, 489 ( 6th Cir. 2009) (citing *UAW v. Yard-Man*, 716 F.2d 1476, 1479 (6th Cir. 1983)).

Under Michigan common law, "if the language of the contract is clear and unambiguous, the court must conclude as a matter of law that the contract reflects the parties' intent; extrinsic evidence thereof may only be considered if the contract is ambiguous." *Elliott Inv. Co., Inc. v. Pulte Home Sciences, LLC*, 2008 WL 5431169, *4 (Mich. App. Dec. 30, 2008) (p.c.) (P.J. Beckering, JJ. Borrello & Davis) (citing *In re Egbert R. Smith Trust*, 745 N.W.2d 754 (Mich. 2008) (Weaver, J., for a unanimous Court)). *Accord Tackett*, 561 F.3d at 489 (citing *UAW v. BVR Liquidating, Inc.*, 190 F.3d 768, 774 (6th Cir. 1999)); *Marentette v. UAW Local 174*, 907 F.2d 603, 611 n.4 (6th Cir. 1990) ("The parol evidence rule does not apply where the language of a written agreement is plain and not susceptible of more than one meaning.").

Like a statute,[2] a CBA must be construed so as to give force and effect to all its provisions, "so as to render none nugatory." *Tackett*, 561 F.3d at 489 and *Cole v. ArvinMeritor, Inc.*, 549 F.3d 1064, 1069 (6th Cir. 2008) (both citing *Yard-Man*, 716 F.2d at 1480).

**DISCUSSION**

The arbitrator's decision cannot stand. The FAA does not permit an arbitrator to re-write clear contractual terms because they do not comport with subjective personal notions of fairness or good business. The arbitrator indulged those notions at the expense of fidelity to the parties' fully-integrated written agreement. The arbitrator may have created the contract she believes the parties *should* have signed; she did not apply and interpret the contract they *did* sign.

The arbitrator noted two cases where a private arbitrator refused to enforce an unambiguous CBA clause which provided that the CBA superseded all past practices to the contrary. But the arbitrator cited not a single decision within the federal common law governing labor and collective bargaining – let alone a decision from any Sixth Circuit court – which permits such an arbitrary practice. Nor did the arbitrator cite a single decision suggesting that Michigan *state* law permits such a willful abrogation of the freedom of contract in any context. The court has not located judicial decisions to that effect. Absent such authority, the arbitrator provides no justification for imposing an outcome which had no basis in the CBA's text – an outcome, on the contrary, which was diametrically contrary to that text.

---

[2]

*See, e.g., In re Best*, 109 F. App'x 1, 3 (6th Cir. 2004) (C.J. Boggs, Daughtrey, <u>N.D. Ohio D.J. Ann Aldrich</u>) ("[W]e are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law.") (citing *Kawaauhau v. Geiger*, 523 U.S. 47, 61-62 (1998)).

In at least three respects, the arbitrator did not merely adopt an untenable interpretation of the governing contract or labor law – in which case *Michigan Family* might obligate this court to sustain the award; rather, she strayed from her charge and was not engaged in interpretation *vel non*.

First, she exceeded her authority and role as defined by the parties in their written agreement. The contract did not state or imply that the arbitrator could modify the contract if she found that the parties had developed reasonable or well-settled expectations contrary to its plain language. The arbitrator's conclusory opinion makes no attempt to reconcile her edict with CBA section 30, wherein the parties clearly agree that any arbitrator will be "governed wholly by the terms of this Contract" and will have "no power or authority to change this Contract in any respect, or to add or to take away any of its terms." *See* Comp Ex 1 at 11. *Cf. Howard P. Foley Co. v. IBEW Local 639*, 789 F.2d 1421, 1423 (9th Cir. 1986) ("Although the 'refusal of courts to review the merits of an arbitration award is the proper approach, *Enterprise Wheel*, 363 U.S. at 596 . . . , we must examine the award to determine if it is fundamentally at odds with the CBA because, according to the CBA, the arbitrator here did not have the 'authority to disregard or modify plain and unambiguous provisions' of the agreement.") (record citation omitted).

In turn, that means the award cannot be squared with CBA section 185, which limited Dematic's contractual obligation to provide insurance coverage to a period of three months (maximum) after a voluntary lay-off. Section 185 can only be read as disclaiming any contractual obligation to pay policy premiums after that period elapsed. Any other interpretation would render the duration-of-benefits language in § 185 superfluous. That result would be contrary to an elementary canon of construction which obtains under federal common law. As the United States Supreme Court recently stated when construing a federal statute, a document "'should be construed

so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . .'" *Corley v. US*, – U.S. –, –, 129 S.Ct. 1558, 1566 (2008) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (quoting 2A Singer, STATUTES AND STATUTORY CONSTRUCTION § 46.06, pp. 181-186 (rev 6th ed. 2000))).[3]

The result sought by the UAW, and imposed by the arbitrator, would violate the same canon of construction under Michigan common law, as well. *See Detroit City Council v. Mayor of Detroit*, – N.W.2d –, –, 2009 WL 1046514, *3 (Mich. App. Apr. 17, 2009) ("Should we adopt defendants' arguments . . . we would be nullifying section 19(1) of the act . . . . It is a well established principle of statutory construction 'that courts should avoid any construction that would render statutory language nugatory.'") (quoting *Flint City Council v. Michigan*, 655 N.W.2d 604, 612 (Mich. App. 2002) (citing, *inter alia*, *McAuley v. GMC*, 578 N.W.2d 282, 284-85 (Mich. 1998))); *Jones v. Slick*, 619 N.W.2d 733, 734 (Mich. App. 2000) (Richard Allen Griffin, J.) ("[T]he court should avoid any construction that would render a statute, or any part of it, surplusage or nugatory.") (citing *Ypsilanti Hsg. Comm'n v. O'Day*, 618 N.W.2d 18, 20 (Mich. App. 2000) (citing *Altman v. Meridian Twp.*,

---

[3]

*See also US v. Santos*, – U.S. –, – n.6, 128 S.Ct. 2020, 2029 n.6 (2008) (Scalia, joined by Souter & Ginsburg, and by Thomas in pertinent part) ("We do not normally read a text in a manner that makes one of its provisions superfluous.");

*Ali v. FBOP*, – U.S. –, 128 S.Ct. 831, 841 (2008) (Thomas, joined by C.J. Roberts, Scalia, Ginsburg & Alito) (referring to "the rule against superfluities").

This is an ancient canon of construction in federal case law. *See, e.g., Pennsylvania v. Coxe*, 4 U.S. 170, 202, 1800 WL 3184, *28 (U.S. March Term 1800) (Yeates, J.) ("I cannot accede to the first construction . . . because it rejects as wholly superfluous, and assigns no operation whatever, to the subsequent expressions 'if any grantee shall persist in his endeavors' . . . ."); *Lewis v. Maris*, 1 U.S. (1 Dall.) 278, 281, 1788 WL 161, *2 (Apr. Session 1788) ("[T]he construction ought to be such, that no word should be rendered void, superfluous, or insignificant.").

487 N.W.2d 155 (Mich. 1992))).[4]

Likewise, to the extent that the arbitrator purported to rely on Dematic's *pre-CBA* practice of paying these benefits for more than three months post-layoff, she exceeded her authority. Neither the arbitrator nor the UAW has reconciled her award with CBA section 185, which declares the parties' agreement that the CBA represents the parties' "entire understanding" and "supersedes *all prior agreements or understandings, written or oral . . . .*" *See* Comp Ex 1 at 71. By giving legal force to the UAW's alleged understanding that post-layoff benefits would continue indefinitely, the arbitrator jettisoned the CBA's post-layoff insurance provisions in favor of just such an "understanding." The Seventh Circuit rejected a very similar argument in *Anheuser-Busch, Inc. v. Int'l Bhd. of Teamsters Local No. 744*, 280 F.3d 1133 (7th Cir. 2002), where the union convinced the arbitrator to disregard provisions quite similar to our CBA's sections 30 and 185. Judge Coffey (joined by Judge Rovner) framed the issue in a way that fits our case:

> The parties stipulated to the parameters of the issue as being, "Did the company violate the labor agreement by changing its practice to conform to the contract provision relating to two-person route commission rates?" It is interesting to note that *the question presented was: "Is the company violating the contract when complying with the written terms of the most recent labor agreement?"*

*Anheuser-Busch*, 280 F.3d at 1135 (emphasis added). Like sections 30 and 185 of the Dematic-UAW agreement, the contract in *Anheuser-Busch*

> contained two clauses that limited the arbitrator's power, the arbitration clause and the "zipper clause," or merger clause. The zipper clause states that: (1) the written agreement constitutes the full and complete agreement between the parties; and (2)

---

4

*See, e.g., Gebhardt v. O'Rourke*, 510 N.W.2d 900, 903-04 (Mich. 1994) ("Interpretations of the statute that suggest that a plaintiff has two years to file suit after discovering the claim [must be rejected because they] render the six-month discovery period superfluous."), *cited by Poly-Flex Const., Inc. v. NT&H, Ltd.*, 582 F. Supp.2d 892, 916 (W.D. Mich. 2008) (Maloney, C.J.).

the written agreement supercedes all prior agreements and practices not specifically preserved in the contract. Further, the contract specified that the arbitrator had "no authority to add to, subtract from, modify or change" the terms of the contract. The zipper clause in its entirety reads:

> This Agreement constitutes the full and complete agreement between the parties and supercedes all prior agreements between the parties or their representatives, oral or written, including all practices not specifically preserved by the express provisions of this Agreement. This Agreement is the entire agreement between the parties and is the result of extensive negotiations in which both parties had the right and the opportunity to submit proposals and to negotiate their proposals with the other party.

*Anheuser-Busch*, 280 F.3d at 1135 (emphasis added). Judges Coffey and Rovner forcefully rejected the arbitrator's award and ordered that the plain language of the CBA be enforced, notwithstanding the union's alleged reliance on the company's practice of doing more than was contractually required. Judge Coffey employed sound reasoning which applies with equal force to our case:

> The arbitrator somehow sustained the union's grievance, and found that the employer's payment of the greater commission rate to all drivers during the brief span of but two months (60 days) of the new five-year contract constituted a "practice," in the eyes of the arbitrator, that rose to the level of a "post-execution amendment" of the agreement. This action, according to the arbitrator, allegedly nullified the company's right to invoke the thoroughly negotiated and mutually agreed upon contract provision dealing with the parties' agreement to have the two-tiered commission rate. The arbitrator somehow made this finding in spite of the very specific and limiting language of the zipper clause of the contract, "*This Agreement . . . supercedes all prior agreements between the parties . . . <u>oral or written</u>, including all practices not specifically preserved by the express provisions of this Agreement,*" as well as the specific arbitration clause *forbidding him from modifying the written contract.*

> The arbitrator recognized that the company's April 27, 1998 decision to pay the two-tier (lower) commission rate to drivers working two-person routes was in full compliance with the terms of the collective bargaining agreement agreed to by the Union and the company in each of the three contracts (1990-2003) referred to herein; that the 1998 contract also contained the zipper clause; and that the 1998 contract was the product of extensive negotiations. But *instead of adhering to the limitations the contract placed on his authority and to the unambiguous and plain language of the contract as it was written, the arbitrator took an end-run around the clear and*

*unambiguous restrictive terms of the contract.* The arbitrator somehow reasoned that because the employer allowed the first two months of the sixty-month contract to elapse before changing its practice to adhere to the written contract's commission rates clause, it thus "deprived the Union of its right to bargain [over commission rates] for almost five years," a result that the arbitrator somehow felt (without any explanation) was a "fundamentally unfair maneuver inconsistent with well-settled principles of collective bargaining."

In a vain attempt to find support for his newly fashioned remedy, the arbitrator reached all the way back and justified his decision in the partial testimony taken at the arbitration hearing that during a worker's strike in 1989, some thirteen years ago, the distributorship's general manager commented to the drivers that the drivers would "have the same pay" whether they worked alone or with a helper. The arbitrator found that this passing statement somehow and someway became an "oral understanding," which, according to the arbitrator, was "readopted" by the employer during the first two months of the 1998 contract in spite of the fact that each of the three most recent [CBAs] (ratified in 1990, 1994 and 1998) contained the very explicit and properly limited zipper clause stating that the contract contained the parties' entire agreement, as well as the identical language dealing with commission rates. Further, these contracts failed to contain any indication, much less language, that the parties had reached any type of oral understanding that all drivers would be compensated equally, much less an understanding that was the product of a meeting of the minds reflecting an enforceable agreement supported by offer, acceptance and consideration, which is so vital to any contract.

Thus, the arbitrator cast aside the written and thoroughly negotiated terms of the agreement and returned to the terms of the contract in effect prior to 1990 by ordering the employer to pay the higher commission to drivers regardless of whether they were working on one[-] or two-person routes. This finding by the arbitrator contradicts and ignores the express language throughout the 1998 contracts at issue, *including the unambiguous terms contained within the commissions rates clause, the arbitration clause, and the zipper clause.*

*Anheuser-Busch*, 280 F.3d at 1135-36 (emphasis in original). Accordingly, the panel majority emphatically rejected the arbitrator's rationalization – very similar to the arbitrator's "reasoning" in our case – that "[a]lthough I cannot 'add to, subtract from, modify or change in any way the terms of this Agreement,' I am not precluded from giving effect to a long-standing practice or oral understanding reaffirmed and readopted by the Company following execution of the agreement."

*Anheuser-Busch*, 280 F.3d at 1136.

The arbitration award is on no more solid ground if it purports to rely on Dematic's alleged practice of paying benefits beyond three months *since this CBA came into effect* (June 2004). It is true that nothing in the current CBA prohibits Dematic from paying for these types of insurance benefits more than three months after a voluntary layoff. And it may well be that Dematic employees came to hope, or expect, that Dematic would keep doing more than it legally "had to do" for voluntarily laid-off employees. But such hopes or expectations have no legal significance under the CBA or under FAA case law. The court discerns no authority for the proposition that by paying more than the CBA required, Dematic somehow effected a non-written amendment to the CBA.

Put another way, the arbitrator offers no precedent suggesting that Dematic's discretionary accommodation with voluntarily laid-off workers somehow became mandatory under the law. Extracontractual payments do not acquire the force of contract merely because a judge or arbitrator subjectively finds it "unfair" for a party to exercise its *clear, bargained-for contractual right* to stop paying them. An employer bargains for a temporal limitation on the *duty* to pay post-layoff benefits *precisely so that this situation does not arise*. Because the UAW agreed to include such a limitation in the CBA, Dematic should have been free to pay extra-contractual benefits whenever it wished, with no risk of an arbitrator inferring that it "really" meant to obligate itself to pay forever (or for six months, or any period of time) once it started paying. To any reasonable arbitrator or judge, CBA section 185 conclusively forecloses that inference.

Nor does the passage of time confer upon the UAW a contractual right to demand that Dematic continue exercising its discretion in the same way; it is irrelevant how long Dematic chose to pay more than the CBA required. Neither the arbitrator nor the UAW presents precedent for such an extraordinary estoppel- or waiver-style theory. On the contrary, *see generally Michigan Elec.*

*Employees Pension Fund v. Encompass Elec. & Data, Inc.*, 556 F. Supp.2d 746, 767 (W.D. Mich. 2008) (Maloney, J.) ("In the earlier decision which held that parties may not orally modify an employer's ERISA/LMRA benefit obligations, our Circuit explained why an employer may not invoke any state-law contract or equitable defenses to avoid such obligations either.") (discussing *Behnke*, 883 F.2d at 460-61).

Finally, there is nothing ambiguous about the duration-of-benefits terms in CBA sections 154, 156, 157 and 158.  *Contrast Tackett*, 561 F.3d at 489-90 (finding ambiguity in CBA section which provided that certain retiring employees will receive "a full Company contribution" towards the cost of health-care benefits, and holding that that term was reasonably susceptible to either party's interpretation, making R. 12(b)(6) dismissal inappropriate).[5]

Accordingly, on this record, an arbitrator or court has no authority to consult extrinsic evidence such as alleged oral agreements (the so-called "Bechtel accord") or the parties' course of dealing or alleged expectations (i.e., Dematic's longstanding practice of paying these benefits longer than the three months required by the plain text of this CBA).  *See, e.g., Central States S.E. and S.W.*

---

[5]

*See also, e.g., IBEW Local 1985 v. Hoover Co.*, 2006 WL 1876588 (N.D. Ohio July 5, 2006):

> Contrary to the Plaintiff's repeated assertion that the 2003 CBA unambiguously prohibits Hoover from transferring the Eagle line, both the arbitrator and this court found the CBA to be somewhat ambiguous.  To ascertain the intent of the parties in light of these ambiguities, the arbitrator focused on the general history of negotiations between the part[ies], analyzing their treatment of the job security issue from the mid-1980s through the current CBA.

*Id.* at *4 (citing, *inter alia*, *Tenn. Consol. Coal Co. v. UMWA*, 416 F.2d 1192, 1198 (6th Cir. 1969) ("*After a finding of ambiguity has been made*, evidence of the surrounding circumstances and the practical construction of the parties is admissible to aid in its interpretation.") (emphasis added) and *Manville Forest Prods. Corp. v. United Paperworkers*, 831 F.2d 72 (5th Cir. 1987) ("In short, the precedents clearly support using past practice and negotiating history *to resolve ambiguities and gaps* in written collective bargaining agreements.") (emphasis added)).

*Areas Pension Fund v. Behnke*, 883 F.2d 454, 463 (6ᵗʰ Cir. 1989) ("[T]he writings evidencing Behnke's obligation to contribute to Central States after April 1984 are not at all ambiguous. Therefore, Behnke cannot introduce the oral CBA to evidence its intent not to be bound to contribute beyond April 1984.") (citing, *inter alia*, *Musto v. Am. Gen. Corp.*, 861 F.2d 897, 910 (6ᵗʰ Cir. 1988) ("clear terms of a written employee benefit plan may not be modified or superseded by oral undertakings on the part of the employer")); *Iron Workers Local No. 65 Pension Fund v. Future Fence Co.*, 2006 WL 2077639, *4 (E.D. Mich. July 24, 2006) (Patrick J. Duggan, J.) ("The Court agrees with the Funds that, regardless of any side understanding between Future Fence and the Union, the Funds are entitled to seek contributions pursuant to the CBAs' express terms."), *recon. den.*, 2006 WL 2927670 (E.D. Mich. Oct. 12, 2006).[6]

Consequently, the court determines that the arbitrator's award is infirm under the FAA because the arbitrator was not even arguably construing or applying the CBA. *See generally Michigan Family*, 475 F.3d at 753 (*en banc*) (Sutton, J.) ("[J]udicial consideration of the merits of a dispute is the rare exception, not the rule. At the same time, we cannot ignore the specter that an arbitration decision could be so 'ignorant' of the contract's 'plain language' . . . as to make implausible any contention that the arbitrator was construing the contract."). Whatever prior CBAs provided, and whatever the parties may have stated in legally-irrelevant, superseded oral agreements, it was the arbitrator's job to construe *this* CBA and only this CBA. *Cf. Totes*, 532 F.3d at 416 (in case where arbitrator was charged with construing the 2002-2007 CBA, "The Arbitrator

---

6

*Accord Grzesick v. Cepela*, 603 N.W.2d 809, 812-13 (Mich. App. 1999) (Richard Allen Griffin, J.) ("If the plain and ordinary meaning of the language is clear, judicial construction is normally neither necessary nor permitted.") (citing *People v. Borchard-Ruhland*, 597 N.W.2d 1, 6 (Mich. 1999)).

. . . opined that 'if Management's decision was violative of the 1998-2001 agreement it is violative of the 2002-2007 agreement.' [I]n reaching the question of the violation of the 2002 CBA, the Arbitrator acted outside the scope of his authority and therefore the supplemental award was properly vacated even under the narrow standard announced by *Michigan Family Resources*.").

In short, the arbitrator here effectively disregarded CBA section 30 (defining and limiting the arbitrator's authority), section 185 (integration or "zipper" clause), and the substantive benefits provisions in sections 154, 156, 157, 158 rather than consulting their language and attempting in good faith to apply them as written.[7][8] *Contrast Michigan Sugar Co.*, 278 F. App'x at 626 ("The

---

[7]

At oral argument, the UAW's counsel repeatedly referred to sections 30 and 185 as "boilerplate." This attempt to denigrate clear terms in a valid contract is unavailing. At least in the context of substantial commercial entities bargaining at arm's length with the assistance of counsel, parties to a contract are entitled to enforce "boilerplate" under the same conditions as terms which are less common or more actively contested in negotiations. *See, e.g., Silva v. Encyclopedia Brittanica, Inc.*, 239 F.3d 385, 389 (**1st Cir.** 2001) ("That the forum selection clause is a boilerplate provision does not *ipso facto* render it invalid. 'It is not the law that one must bargain for each and every written term of a contract.'") (quoting *Lambert v. Kysar*, 983 F.2d 1110, 1119-20 (1st Cir. 1993));

*Smith Barney, Inc. v. Harridge*, No. 99-6086, 201 F.3d 449, 1999 WL 1188856, *4 (**10th Cir.** Dec. 14, 1999) (so long as the contract itself is not one of adhesion or otherwise unconscionable, "the mere fact that arbitration contract language is 'boilerplate' does not render it without effect");

*City of Austin, Texas v. Decker Coal Co.*, 701 F.2d 420, 433 (**5th Cir.**) (Randall, J., dissenting) ("Whether article 5 is boilerplate or not is irrelevant because whatever is in the contract we are required to enforce."), *reh'g denied*, 705 F.2d 1448 (5th Cir. 1983);

[8]

If the UAW objected to § 30 or § 185, it could have negotiated their modification or removal. The UAW acknowledged as much in the CBA itself. *See* CBA § 3 ("The parties acknowledge that during the negotiations which resulted in this Agreement, each had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining . . . .").

Having failed to negotiate the modification of §§ 30 and 185, the UAW must bear the consequences of its decision to accept the CBA in its current form. *Accord EEOC v. Indiana Bell*

-23-

arbitrator's opinion has 'all the hallmarks of interpretation,' because, like the arbitrator in [*MFR*], the arbitrator quoted from and analyzed the pertinent provisions of the CBA."); *UAW Local 174 v. Mich. Mech. Servs.*, 247 F. App'x at 653 ("Like the arbitration decision in [*MFR*], the arbitration decision at issue here has all the hallmarks of interpretation. * * * '[A]t no point did he say anything indicating that he was doing anything other than trying to reach a good-faith interpretation of [the relevant contractual provisions].'") (citations omitted, brackets in original); *Marine Mechanical Corp. v. Int'l Union*, 2008 WL 906119, *6 (N.D. Ohio Mar. 31, 2008) (Boyko, J.) (confirming arbitration award and noting, "Throughout the arbitrator's thirty-seven page decision he *constantly and consistently referred to and applied the relevant provisions of the parties' CBA in reaching his conclusion*.") (emphasis added).

By eschewing genuine interpretation and instead ordering the outcome which he considered more just, the arbitrator "enter[ed] the forbidden world of 'effectively dispensing his own brand of industrial justice,' making [his] decision 'unenforceable.'" *Great Lakes Energy Cooperative v. Local 876 IBEW*, 2008 WL 299022, *7 (W.D. Mich. Feb. 1, 2008) (Robert Holmes Bell, C.J.) (quoting *Michigan Family*, 475 F.3d at 752 (*en banc*) (quoting *MLBPA v. Garvey*, 532 U.S. 504, 509 (2001))); *see also Great Lakes Energy*, 2008 WL 299022 at *10 ("[G]iven that the Court's analysis of the arbitration award yielded the conclusion that the arbitrator was dispensing her own brand of

---

*Tel. Co.*, 256 F.3d 516, 522 (7th Cir. 2001) (*en banc*) (Easterbrook, J.) ("Ameritech could have negotiated for a provision defining sex harassment . . . as 'just cause,' or limiting arbitrators' authority to reinstate persons discharged for events that violate federal law.  But it did not do this . . . . *Ameritech must itself bear the consequences of its labor-relations decisions*.") (emphasis added) (citing *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum and Plastic Workers of America*, 461 U.S. 757, 766-70 (1983));

industrial justice . . . , the presumption that the arbitrator was engaged in interpretation is inapplicable.").  As the Seventh Circuit aptly put it,

> [a]n arbitrator cannot shield himself from judicial by merely making noises of contract interpretation.  In other words, *the arbitrator cannot dress his policy desires up in contract interpretation clothing*. [If he does so, he] exceed[s] the scope of his authority, and his award must be reversed.

*Anheuser-Busch*, 280 F.3d at 1138 (Coffey, J., joined by Rovner, J.) (internal citations & quotation marks omitted) (emphasis added).


## ORDER

Plaintiff Dematic's motion for summary judgment [**document #16] is GRANTED**.

Defendant UAW's motion for summary judgment [**document #18] is DENIED**.

The decision issued by arbitrator Elaine Frost on May 7, 2008 in Michigan is **VACATED**.

The defendant is **NOT ENTITLED** to the award of benefits which it seeks.

The separate judgment required by FED. R. CIV. P. 58 is issued contemporaneously.

**This is a final and appealable order.**  *See Totes*, 532 F.3d at 410 ("This Court reviews a district court's grant of summary judgment in a labor arbitration dispute *de novo*.") (citing *Way Bakery v. Truck Drivers Local No. 164*, 363 F.3d 590, 593 (6th Cir. 2004)).

IT IS SO ORDERED on this <u>16th</u> day of July 2009.

/s/ Paul L. Maloney
Honorable Paul L. Maloney
Chief United States District Judge